

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00357-CV

_____

GRIFFIN PARC RESIDENTIAL ASSOCIATION, INC., Appellant

V.

JOHN C. KING, Appellee

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. 17-3380-158

Before Sudderth, C.J.; Pittman and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

Appellant Griffin Parc Residential Association, Inc. (the HOA) raises one issue challenging a summary judgment obtained by Appellee John C. King (Owner). Owner owns a lot in the Griffin Parc subdivision administered by the HOA. The trial court rendered judgment that the HOA acted in violation of the Bankruptcy Code's automatic stay when it sent Owner notice of the amount of the HOA's annual maintenance assessment. The trial court found that the notice was a part of the collection process for unpaid assessments, that the notice was a necessary act to create an assessment lien against Owner's property, and that the bankruptcy stay in effect when the notice was sent made the notice void because it was a part of the lien-creation process.

We disagree. Both the lien and the debt that obligated Owner to pay the assessment existed long before the notice was sent. The notice merely quantified the debt that Owner was previously obligated to pay as a result of his ownership of a lot in the subdivision administered by the HOA. Thus, the notice did not create or enforce a lien and did not violate the automatic stay. We reverse the judgment of the trial court and render judgment in favor of the HOA.

### II. Procedural Background

The HOA filed an "Application for Expedited Foreclosure Proceeding Pursuant to Rule 736 of the Texas Rules of Civil Procedure" in which it sought to

foreclose its lien on a lot in the subdivision that the HOA administered. *See* Tex. Prop. Code Ann. § 209.0092; Tex. R. Civ. P. 736.1. Owner resided on the lot. The lien that the HOA sought to foreclose allegedly was defaulted after Owner failed to pay the HOA's 2016 maintenance assessment.

Owner responded to the HOA's foreclosure action by filing a suit for declaratory judgment. That suit stayed the foreclosure action because it "put[] in issue . . . [the] enforcement of the . . . lien" that was the basis of the HOA's suit. *See* Tex. R. Civ. P. 736.11. Owner alleged that he had filed a bankruptcy proceeding under Chapter 7 of the United States Bankruptcy Code before the HOA sent notice of the 2016 annual maintenance assessment. Though Owner conceded that the lien that the HOA sought to foreclose had its origins in the Declaration governing the subdivision filed in 2001, he contended that the notice was "necessary" to enforce the lien that the HOA sought to foreclose. Specifically, Owner alleged that

> the 2001 lien, while forming a basis for Griffin Parc's claim of its lien rights, and without which it could not, fifteen years later, claim a right of foreclosure, was merely necessary but not sufficient to enforce an assessment. Other things had to take place, namely: Assessment of the amount due for 2016, notice of the . . . annual assessment, non-payment on or before the due date, the assessment lien which arose on the delinquency date, and later a *notice* of assessment lien.

Allegedly, "[these] additional, necessary steps [were required] to make the 2001 lien effective [but] were void ab initio" because the Bankruptcy Code stayed the ability of any creditor to create a lien against property that was part of a bankruptcy estate. *See* 11 U.S.C.A. § 362(a) (West 2015).

3

The parties filed cross-motions for summary judgment. The trial court granted Owner's motion for summary judgment and denied the HOA's. The summary-judgment order included a finding that the HOA had sent notice of the assessment that was the basis for its foreclosure claim during the time that a creditor's actions were stayed by the Bankruptcy Code. For this reason, the judgment decreed that the notice "was ineffective notice, necessary to create an assessment lien which assessment lien was essential to [the HOA's] enforcement action." Owner nonsuited other claims made in his declaratory-judgment action, making the trial court's summary-judgment order a final judgment. The HOA appealed.

## III. Factual Background

The legal effect of the notice sent by the HOA to Owner and the nature of the HOA's lien are hotly contested, and we will deal with the factual details of the notice and lien during our discussion of the document in which they have their origin. But this appeal also turns on the timing of certain events because they establish the framework of the two underlying questions that we must resolve: (1) when did the HOA's lien and the debt to pay the assessment come into existence, and (2) during what period did the provisions of the Bankruptcy Code impact the HOA's actions.

The timing of the four pivotal events in this case's chronology is undisputed. First, in 2001, the developer of the subdivision that included the lot at issue filed in the appropriate deed records a "Declaration Of Covenants, Conditions[,] And Restrictions For Griffin Parc" (the Declaration) that created covenants to establish

4

the rules and regulation of the HOA. Second, Owner purchased his lot in the subdivision in 2004. Third, Owner filed his Chapter 7 bankruptcy proceeding on November 3, 2015. Fourth, sometime in late December 2015 or early January 2016, the HOA sent Owner a notice of the 2016 annual maintenance assessment due the HOA.[1]

All agree that the notice was sent during the time that the Bankruptcy Code stayed the ability of a creditor to create or enforce a lien. Other acts relating to the assessment lien, such as filing notice of the lien in the relevant deed records and the suit to foreclose the lien, occurred after Owner was discharged from bankruptcy and after the stay no longer was in effect.

## IV. The Standard of Review Governing Cross-Motions for Summary Judgment

We apply a de novo standard of review to summary judgments. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). "When competing summary-judgment motions are filed, 'each party bears the burden of establishing that it is entitled to judgment as a matter of law.'" *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 278 (Tex. 2018) (quoting *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000)). "[I]f 'the trial court grants one motion and denies the other, the reviewing court should determine all questions presented' and 'render the

---

[1] At oral argument, the HOA acknowledged that a copy of the notice is not a part of the record because the HOA could not locate it in its records.

judgment that the trial court should have rendered.'" *Id.* (quoting *City of Garland*, 22 S.W.3d at 356).

## V. Discussion

### A. How the provisions of the Bankruptcy Code overlay this appeal

The Bankruptcy Code creates distinctions that frame this appeal. The distinctions begin with the principle that a creditor may have the right to pursue a debtor in bankruptcy personally and that a discharge in bankruptcy may not free the debtor from ongoing personal liability on the debt. But a complication arises if the creditor chooses the wrong time in the process to create a lien to secure the debt. The creditor may find that the Bankruptcy Code voids that attempt even though that creditor could otherwise pursue the debtor to collect the debt.

Owner relies on these distinctions to argue that no matter whether he might have been personally liable for the 2016 annual maintenance assessment or whether the HOA might have pursued a judgment for the assessment, the HOA's attempt to create or to enforce a lien to secure that debt during the bankruptcy stay was void. His premise is that the notice created the lien because it was a precondition to the enforcement of the lien securing payment of the assessment and that the HOA sent the notice during the automatic bankruptcy stay that made its act void because the Bankruptcy Code stayed that action. This argument creates our starting point to describe the bankruptcy principles and the terms that govern here when we as a state court apply federal bankruptcy law to resolve a state-court foreclosure suit.

6

The filing of a bankruptcy petition "operates as a stay" of certain actions, mostly of creditors against debtors who have filed bankruptcy. *See* 11 U.S.C.A. § 362(a). Whether the stay stops a creditor from taking an action against a debtor often turns on the time that the debt arises. Debts that arise after the filing of a bankruptcy petition, termed post-petition debts, may often be pursued and collected from a bankruptcy debtor. *In re Zamora*, No. 11-52138C, 2012 WL 4501680, at *1–2 (Bankr. W.D. Tex. Sept. 28, 2012) (mem. op.). The HOA and Owner agree that the annual maintenance assessment in this case was a post-petition debt because it became due after the filing of Owner's bankruptcy petition.[2]

Though the stay does not prohibit collection efforts for a post-petition debt against the debtor personally, that does not mean the creditor may also take actions impacting property held by the bankruptcy estate. Once a bankruptcy is filed, the debtor and the bankruptcy estate exist in two separate entities. The bankruptcy estate usually consists of property owned by the debtor when he or she files bankruptcy. *See* 11 U.S.C.A. § 541(a)(1) (West 2016); R. *Hassell Builders, Inc. v. Texan Floor Serv., Ltd.*, 546 S.W.3d 816, 827 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("The

---

[2]Not all federal courts conclude that assessments billed after the filing of bankruptcy constitute a post-petition debt. *See, e.g.*, *Goudelock v. Sixty-01 Ass'n of Apartment Owners*, 895 F.3d 633, 638 (9th Cir. 2018) (stating that owner's personal obligation to pay the condo association assessments "was not the result of a separate, post-petition transaction but was created when she took title to the condominium unit. As a result, the debt for the assessments arose pre-petition and is dischargeable under Section 1328(a), unless the Bankruptcy Code provides an exception to discharge"). In this appeal, Owner does not argue the assessment is a pre-petition debt.

Bankruptcy Code defines 'property of the estate' broadly to include 'all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case.'" (quoting *Houston Pipeline Co. v. Bank of Am., N.A.*, 213 S.W.3d 418, 424 (Tex. App.—Houston [1st Dist.] 2006, no pet.))).[3] Some property, such as the lot that was Owner's homestead, can pass out of the bankruptcy estate while the bankruptcy case is pending.[4]

The automatic stay prevents a creditor from taking certain actions against the property of the estate, even though the creditor is pursuing a post-petition debt. *See Zamora*, 2012 WL 4501680, at *2 ("However, 'the right to undertake collection activity, including filing a lawsuit, to collect a post-petition debt does not allow all

---

[3]As one author explained,

> Commencement of a bankruptcy case creates in effect an "estate" by operation of law. The estate consists of the various types of property described in 11 U.S.C.A. § 541 "wherever located and by whomever held." 11 U.S.C.A. § 541(a); *Texas-Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129, [143–44] (Tex. App.—Texarkana 2000, no pet.). With limited exceptions[,] the debtor's bankruptcy "estate" is comprised of all the debtor's legal or equitable interests in property as of the commencement of the bankruptcy action . . . .

2 Robin Russell et al., *Texas Practice Guide: Creditor's Rights* § 7:62 (Nov. 2018).

[4]Property that the debtor claims to be exempt from creditor's claims, such as a homestead, can cease being property of the estate even before the bankruptcy concludes. If an interested party does not challenge the debtor's claim that property is exempt, the property passes out of the estate thirty days after the first meeting of creditors. 15 W. Mike Baggett, *Texas Practice Series: Texas Foreclosure: Law and Practice* § 16.02 (Apr. 2018). No one contends that the lot at issue—though Owner's homestead—passed out of the bankruptcy estate before the HOA's actions that Owner contends improperly attempted to create or enforce a lien against the lot.

collection activities.'" (quoting *Montclair Prop. Owners Ass'n v. Reynard (In re Reynard),* 250 B.R. 241, 245 (Bankr. E.D. Va. 2000))). The aspect of the automatic stay at issue in this case prevents "any act to create, perfect, or enforce any lien against property of the estate." *See* 11 U.S.C.A. § 362(a)(4). In other words, the stay may not impede a creditor from pursuing a debtor personally on a post-petition debt, but it may prevent the creditor from creating, perfecting, or enforcing a lien on property of the bankruptcy estate to secure that debt.[5] And if the attempt to create or enforce the lien occurs while the stay is in effect, that act has no effect; the Texas Supreme Court is clear that acts in violation of the stay are not merely voidable but void. *See York v. State,* 373 S.W.3d 32, 38 (Tex. 2012); *Cont'l Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex. 1988).

---

[5]*Reynard* summarized the distinction as follows:

The right to undertake collection activity, including filing a lawsuit, to collect a post-petition debt does not allow all collection activities. The automatic stay prevents any act to create, perfect, or enforce any lien against property of the estate, and any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. [11 U.S.C.A.] §§ 362(a)(4) and (a)(3), respectively. Consequently, a post-petition creditor who has the right to initiate a suit against a debtor and [to] obtain a judgment for a post-petition debt without violating the automatic stay may not have recourse to execute on all assets that would have been, but for the filing of a chapter 13 petition, property of the debtor. Recourse is limited to property that is not property of the estate.

250 B.R. at 244–45.

Further, not every debt is discharged in bankruptcy. One debt excepted from discharge in a Chapter 7 proceeding (such as Owner filed) is

> for a fee or assessment that becomes due and payable after the order for relief to a membership association with respect to the debtor's interest in . . . a lot in a homeowners['] association, for as long as the debtor or the trustee has a legal, equitable, or possessory ownership interest in . . . such lot . . . .

11 U.S.C.A. § 523(a)(16) (West 2016). Thus, Owner's discharge—the relief that bankruptcy gives for liability on the debt—did not include the debt for the post-petition assessment that began this controversy.

The status of the debt and the fact that Owner did not receive a discharge from it has no impact on the question we face. Our question focuses on whether sending the notice of the assessment during the period the stay was in place "created" or "enforced" the lien that the HOA sought to foreclose. *See id.* § 362(a)(4). In its most general terms, the question is whether sending notice of the assessment created the lien because it was some type of precondition to the HOA's ability to claim a lien against the lot and whether the attempt to perform that precondition during the period of the stay effectively rendered the attempt void. This question is not impacted because Owner was not discharged for the underlying debt. As we have described, the bankruptcy scheme creates situations where even if the debt survives the process, a lien created during the period of time the stay is in place is void.

As another point of clarification, the issue before us deals only with whether a lien secured the 2016 assessment. We do not deal with whether the owner of a lot

would be liable for the assessments occurring after the discharge and whether the lot would stand as security for that debt.[6]

### B. A determination of the effect of the bankruptcy stay requires an examination of when the HOA's assessment lien came into existence.

The outlined bankruptcy principles that mark a temporal boundary during which a lien cannot be created or enforced cause a quandary when applied to the lien at issue in this appeal—the lien the HOA sought to foreclose because Owner failed to pay the 2016 annual maintenance assessment. We must decide whether that lien was created when the Declaration governing the HOA was filed, more than fifteen years before the bankruptcy stay went into effect, or whether the lien is not fully created and enforceable until the HOA's notice was sent during the period the stay was in place. In other words, does the lien circle over the lot like the development's Griffin

---

[6]We note a distinction created by the Bankruptcy Code that is not relevant to our disposition because Owner filed a Chapter 7 petition. The discharge exception in in section 523(a)(16) may not apply to the discharge received by a Chapter 13 debtor. *See In re Wiley*, 581 B.R. 441, 450 (Bankr. D. Md. 2018) (refusing to adopt "the position advocated by the Condominium" that essentially asked the bankruptcy court "to rewrite the Bankruptcy Code to insert the § 523(a)(16) discharge exception into § 1328(a)"). *Wiley* lifted the stay to permit the condo association to reduce its claim to judgment because a discharge had not been entered. *Id.* at 451–52. But *Wiley* also noted that "a Chapter 13 debtor's obligation to pay post-petition condominium assessments continues up to the time of entry of a discharge under § 1328(a) of the Bankruptcy Code, at which time the condominium's *in rem* remedies survive, but the *in personam* obligations of the debtor are discharged." *Id.* at 447. We reference *Wiley* simply to note that our opinion is not a one-size-fits-all opinion in its application of bankruptcy law to assessments for commonly-owned property.

namesake, waiting to pounce if the assessment is not paid, or does it rise like a phoenix each year if a lot owner does not pay the annual maintenance assessment?[7]

It is not clear from Owner's argument whether he is arguing that the acts of the HOA created or enforced a lien in violation of section 362(a)(4). We interpret his argument and the recitations in the trial court's judgment to mean that the notice created the debt to pay the assessment and that without that debt, the lien did not exist.

> Owner's brief states the issue as follows:
>
> *If there were no notice of assessment, there would be no due date, no delinquency date, no continuing debt, no lien, no notice of lien, and no foreclosure.* [The HOA] would have us engage in a form of time travel, that in July of 2001 [Owner's] unpaid assessment, from fifteen years later, had already created an [enforceable] lien. *It might have been a lien, but it lacked a piece to its effectiveness: the unpaid amount on the delinquency date. Notice and demand for payment, and the delinquency date, had not happened yet.* [Emphasis added, citation omitted.]

The theme that the notice created the debt—and thus, the lien—is carried forward into the trial court's finding that the notice "was ineffective notice, *necessary to create an assessment lien* which assessment lien was essential to [the HOA's] enforcement action against" Owner. [Emphasis added.]

These statements still leave us grasping for the answer as to why Owner and the trial court contend that the notice served "to create an assessment lien." As we

---

[7]The nature of the lien is one we determine under Texas law. *See Douglas v. Delp*, 987 S.W.2d 879, 883 (Tex. 1999) ("Courts look to state law to characterize the 'property rights in the assets of a bankrupt's estate.'" (quoting *Butner v. United States*, 440 U.S. 48, 54–55, 99 S. Ct. 914, 918 (1979))).

note below, the Declaration established every aspect of the obligation to pay the assessment and the lien to secure that obligation, including the fact that the assessment became delinquent the day following its due date. The Declaration does provide that the amount of the assessment is set annually; it states that the Board of the HOA shall "fix the date of the commencement and the amount of the annual maintenance assessment against each Lot." The Declaration then provides for written notice of the assessment. In this scheme, the notice serves the function of communicating to a lot owner the Board's decision about the date the assessment is due and its amount. Thus, we conclude that the question we must answer is whether quantifying the amount of the assessment created the lien even though the Declaration states that it impressed upon the lot a lien for the payment of future assessments from the date it was filed and established a continuing debt to pay the assessment.

We hold that the lien was created by the filing of the Declaration in 2001 and not the issuance of the notice in 2015 or 2016. If the covenants creating a declaration governing a subdivision are appropriately drafted, the Texas Supreme Court holds that a lien to secure the payment of assessments exists from the time of filing the declaration. *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 633–37 (Tex. 1987). The declaration also creates an obligation to pay assessments that is "an inherent part" of a lot owner's property interest. *Id.* at 636. In this way, the

underlying debt and the lien to secure its payment exist from the date of the filing of the declaration and are not created by notice of the assessment.

In this case, the Declaration that governs the lot at issue creates a lien against the lot that attached at the time it was filed. That Declaration also created the debt to pay the assessment and made that obligation a charge on the ownership of the lot. Thus, the lien that the HOA sought to enforce was created long before the bankruptcy stay went into effect, and the stay did not affect its existence.

## C. The Texas Supreme Court holds that a lien to secure the payment of HOA assessments may come into existence and attach when the declaration creating covenants governing the property is filed.

In *Inwood*, the Texas Supreme Court dealt with the priority of an assessment lien versus a lot owner's homestead rights. *Id.* at 633. In *Inwood*, a developer of a subdivision had filed a declaration of covenants and restrictions years before homeowners purchased lots in the subdivision. *Id.* at 633–34. Specifically, the question before the supreme court was whether the contractual lien described in the declaration existed before the homeowners took title to their lots. *Id.* at 635.[8]

---

[8]The usual scheme of a subdivision as a common-interest development is as follows:

> Subdivision Developments are Common-Interest Developments that consist of parcels of land, usually called "Lots," that are subject to separate conveyance and exclusive ownership. In most cases, Subdivision Developments arise where a large tract of land is owned by a real estate developer who divides the tract into separate, individually-owned Lots by filing a subdivision plat with the local governmental entity. The subdivision plat must be approved by such local government

14

The answer to this question turned on when a lien for assessments attached. The date of attachment answered the question of whether the lien was superior to the the homestead right in the lots because "if the lien attached prior to the claimed homestead right and the lien is an obligation that would run with the land, there would be a right to foreclose." *Id.*

*Inwood* held that a covenant runs with the land "when it touches and concerns the land; relates to a thing in existence or specifically binds the parties and their assigns; is intended by the original parties to run with the land; and when the successor to the burden has notice." *Id.* The opinion concluded that "[t]he covenant to pay maintenance assessments [created by the declaration that governed the subdivision] for the purpose of repairing and improving the common areas and recreational facilities of Inwood North touches and concerns the land." *Id.*

---

entity and will typically divide the parcel of land into . . . (1) residential Lots that are to be separately owned by homeowners; (2) "Common Areas" that are to be owned by a Homeowners Association made up of and for the benefit of the Lot owners; and (3) streets to provide access by the owners to their Lots. The key distinguishing element of this type of development is that each Lot is a separate, exclusively-owned parcel of real property and [that] the Common Areas of land are owned by the Homeowners Association for the benefit of the Lot owners.

Gregory S. Cagle, *HOA Assessment Liens: Everything You Need to Know to Figure Out Your Head From Your Assessment Lien*, State Bar of Tex. Prof. Dev. Program, 34th Annual Advanced Real Estate Law Course 14, 8 (2012), https://ssjmlaw.com/wp-content/uploads/2012/05/2010-Advanced-Real-Estate-Law-Article-HOA-Assessment-Lien-Foreclosure.pdf.

Most important to our resolution of this appeal, the supreme court held that the lien existed prior to the time the owners took title to their lots:

> The record discloses that the liens were contracted for several years before the homeowners took possession of their houses. Because the restrictions were placed on the land before it became the homestead of the parties, and because the restrictions contain valid contractual liens [that] run with the land, the homeowners were subject to the liens in question[,] and an order of foreclosure would have been proper.

*Id.* As support for its holding, the supreme court relied on an opinion from the Florida Supreme Court that even more explicitly held that an appropriately drafted declaration created a lien that related back to the time of its filing:

> [T]he creation of the lien by acceptance of the deed relates back to the time of the filing of the declaration of restrictions. Thus, with regard to the time of attachment of the lien, this case is to be treated as if the respondents (homeowners) had taken title subject to a valid pre-existing lien. Since the acquisition of homestead status does not defeat prior liens . . . the lienor's right prevails over the respondent's homestead right.

*Id.* at 636 n.1 (quoting *Bessemer v. Gersten*, 381 So. 2d 1344, 1348 (Fla. 1980) (op. on re'g)).[9]

_____

[9]As a bankruptcy court dealing with a condominium plan described the duties created by the covenants governing the common interest, the covenant is not a contract by which a homeowners' association provides services to condo owners but is instead a burden on an owner's interest in the common areas to maintain the property in which the owner holds an interest:

> The covenants made in the [d]eclaration serve to benefit not a discrete third party . . . but rather all the owners in common, imposing a burden on each owner for the benefit of all owners. The homeowners' association is nothing more than a mechanism by which this covenant is enforced . . . and can best be appreciated as an agent for *all* the owners in common. **Each condominium owner finds her estate both burdened by the assessment obligation** and benefited by the function

16

Thus, the declarations in *Inwood* created not a potential lien but one that existed from the time of the declaration's filing.

## D. The obligation to pay an assessment is also created by the Declaration.

We also read *Inwood* to hold that the continuing debt to pay an assessment is sufficient to underlay the lien and that the lien is not recreated each time an assessment is quantified. The debt that underlays the lien—the obligation to pay an assessment—is an equitable servitude that attaches to the property from the time of filing the declaration. As with other kind of debts, the precise amount of the debt relies on subsequent events. But that contingency does not mean that there is not a sufficient debt to support the existence of the lien from the time of filing the declaration.

The supreme court in *Inwood* described the obligation that attaches to a lot in a subdivision where covenants govern the ownership and management of the subdivision's common areas. Specifically, "[t]he purchase of a lot in Inwood Homes *carries with the purchase, as an inherent part of the property interest, the obligation to pay association fees for maintenance and ownership of common facilities and services.* The remedy of foreclosure

---

that the assessments serve (namely, the maintenance and preservation of the common areas, in which the debtor has an undivided interest inseparable from her interest in the condominium unit itself).

*Beeter v. Tri-City Prop. Mgmt. Servs., Inc. (In re Beeter)*, 173 B.R. 108, 114–15 (Bankr. W.D. Tex. 1994) (bold emphasis added).

17

is an inherent characteristic of the property right." *Id.* at 636 (emphasis added). In addition to the theory that the declarations created a contractual lien, *Inwood* also viewed this mutual and reciprocal obligation of property owners in a development to pay assessments as an "an inherent property interest possessed by each [lot] purchaser." *Id.*

*Inwood* cited and appears to have rejected an argument that raised a variation of the argument Owner makes—that no lien exists to pay an assessment because the debt creating the obligation to pay did not arise until the assessment became due. The issue arose through *Inwood*'s citation of *Johnson v. First Southern Properties, Inc.*, 687 S.W.2d 399 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). *Id. Inwood* cited *Johnson* for the proposition that principles governing a condominium scheme should apply equally to "pro rata common ownership in an association, mandated by the declaration." *Id. Johnson* held that in the context of a condominium scheme, "the assessment lien constituted a valid pre-existing debt which would overcome the homestead claim." 687 S.W.2d at 402. In a footnote, *Inwood* refenced an analysis of *Johnson* contained in a law review article. *Inwood*, 736 S.W.2d at 636 n.2 (citing Craig Florence, Note, *Johnson v. First Southern Properties Inc: The Texas Homestead and Condominium Assessments*, 38 Baylor L. Rev. 987 (1986)).

The cited law review article criticized *Johnson*'s holding that a preexisting debt, and thus a lien, burdens the property because the assessment lien should not owe its existence to the filing of the declaration rather than to the issuance of an assessment.

18

The criticism turned on the fact that a lien must be underlaid by a debt, and that no debt underlays any lien until an assessment is made; thus, the assessment lien did not preexist but rose as the phoenix each time the debt arose:

> The question is reduced to whether the contract created a prior debt and lien. Although the court necessarily assumed the existence of a valid pre-existing debt, this conclusion is suspect. To have a security interest in the property, there must be a debt. In *Johnson*, there was no liability for future assessments until the assessments were determined by the homeowner's council. Even when the assessments were made, they could be changed later. Therefore, there was not a debt for such assessments until after Johnson established his homestead in the condominium apartment. The court held that Johnson took ["]the apartment *subject to* the declaration, which declaration designated that the homeowner[s'] . . . council had an assessment lien.["] It would appear, however, that since the assessment fee was not due until after Johnson established his homestead, then a valid lien did not arise until after the [homestead] was established. In that case, because the lien was not for purchase money, improvements, or taxes, it would be void.

38 Baylor L. Rev. at 995–96 (footnotes omitted).

The supreme court in *Inwood* held a homeowners' association lien and the debt to pay an assessment existed from the time of filing the covenants and declaration in the face of the Note's criticism of *Johnson* that no lien could exist without an underlying debt. The supreme court was obviously aware of this conceptual challenge to its holding on the existence of a preexisting debt because it cited the article that contained the criticism. The Note's criticism that no debt existed to underlie the lien established in the declaration did not deter the supreme court from its holding.

The article's theory that no debt underlies the lien also revealed a misconception of the obligation to pay an assessment. Though sometimes described

as a contract, the assessment obligation arises not as a result of an annual agreement for the owner to pay the fee to maintain the common areas but as an equitable servitude on the lot:

> The homeowners' association is not a discrete party performing maintenance services for a fee. It is merely the agent of each and every owner, a mechanism created as part and parcel of the equitable servitude [that] burdens the estate of each owner, functioning to assure that each owner receives the benefits that the equitable servitude was intended to confer. There need be no "contract" to impose this servitude on the property. It was imposed on the property when the estate in land was created pursuant to the documents that created the condominium regime, pursuant to state law. No consideration passed, no meeting of the minds took place (or needed to take place), incident to the creation of this equitable servitude imposed on the estate. The owners could not have avoided the terms of the equitable servitude when they purchased the property, even had they wanted to.

*Beeter*, 173 B.R. at 115. Thus, the ownership of the lot in the subdivision carries with it the obligation to pay the annual maintenance assessment, and that servitude creates both the lien and the obligation to pay the assessments as they become due.

In accordance with *Inwood*, we hold that the assessment lien exists from the time of the filing of a declaration rather than the time that an assessment was made. And the ownership of the lot carries the ever-present obligation to pay the assessments. Though we agree that the dollar amount of the annual maintenance assessment is not set in the Declaration, that fact does not undermine the obligation to pay the assessment as a covenant running with the land. Indeed, it appears impractical for the Declaration to set the amount of an assessment that would respond to the need of the subdivision fourteen years after its filing. But that does

20

not mean the obligation to pay the debt as it arose did not exist upon the filing of the Declaration.

Also, it is hardly unusual for a lien to secure a debt that has not yet been quantified or is contingent on a future event. For example, a lien may secure the payment of future taxes by the mortgagee on behalf of the mortgagor. *See, e.g., Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 336 (Tex. 1980) ("Many Texas cases have held that if a mortgagor fails to pay taxes he has promised to pay, the mortgagee may treat the amount owed for taxes as part of the mortgage debt."); *Vista Dev. Joint Venture II v. Pac. Mut. Life Ins. Co.*, 822 S.W.2d 305, 307–08 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (holding that liability for unpaid taxes accruing on property may be secured by both a lien and a personal liability of maker of note). Further, a lien may contain a dragnet clause that secures future but not yet quantified advances of debt. 2 James N. Johnson, *Texas Practice Guide: Real Estate Transactions* § 10:21 (Sept. 2018) ("A 'dragnet' clause in a mortgage or deed of trust refers to a provision creating a lien securing all indebtedness of the mortgagor to the mortgagee, whether past or future, prior to discharge of the lien.").[10]

---

[10]In fact, the court of appeals' opinion in *Inwood* recognized that "[a]n owner of real property may, *by executing a written instrument*, create a lien on his property to secure payment of future advances." *Inwood N. Homeowners' Ass'n, Inc. v. Pamilar*, 707 S.W.2d 125, 126 (Tex. App.—Houston [1st Dist.] 1986) (op. on reh'g) (citing *First Nat'l Bank of Corsicana v. Zarafonetis*, 15 S.W.2d 155, 158 (Tex. App.—Waco 1929, writ ref'd)), *rev'd*, 736 S.W.2d 632 (Tex. 1987). The court of appeals held the covenants governing the property did not create a lien but only an unsecured obligation to pay the

And one court interpreting the Bankruptcy Code reasoned that a contingent, unmatured obligation to pay an assessment constituted a debt as defined by bankruptcy law (though it described the obligation as a contract and dealt with whether the debt was a pre- or post-petition debt):

> Under those broad definitions of claim and debt, the Rostecks had a debt for future condominium assessments when they filed their bankruptcy petition. *It is true that the Rostecks did not actually owe money to Old Willow for assessments beyond those Old Willow had assessed before their bankruptcy. But the condominium declaration is a contract, and by entering that contract[,] the Rostecks agreed to pay Old Willow any assessments it might levy.* Whether and how much the Rostecks would have to pay in the future were uncertain, depending upon, among other things, whether the Rostecks continued to own the condominium and whether Old Willow actually levied assessments. But, as we have seen, contingent, unmatured, unliquidated, and unfixed debts are still debts. "Contingent" means: "'Possible but not assured; doubtful or uncertain; conditioned upon some future event which is itself uncertain or questionable . . . . [I]t implies that no present interest exists, and that whether such interest or right will ever exist depends upon a future uncertain event.'" *This definition describes perfectly the Rostecks' obligation for future assessments: they agreed to make payments, but whether and how much they actually had to pay depended on future uncertain events. The Rostecks thus had a debt for the future assessments under the Bankruptcy Code's broad definition of debt.*

*Matter of Rosteck*, 899 F.2d 694, 696–97 (7th Cir. 1990) (emphasis added).

Thus, the Texas Supreme Court, general principles of mortgage law, and bankruptcy courts agree that a contingent debt may be sufficient to support the general existence of a lien and to secure the specific payment of a homeowners' association's assessments. We now answer the question that we began with. Both the

assessments. *Id.* The supreme court obviously rejected the holding that no lien could secure the obligation to pay future advances.

obligation to pay the assessment and the lien to secure the ever-present obligation to pay it do circle over the property rather than spring into existence each year. Contrary to Owner's argument, an assessment is a debt that exists before the amount of the assessment is set, and the existence of the lien to secure that debt is not dependent on the amount of the assessment being set by the Board.

## E. The Declaration creates both the obligation to pay assessments and the lien to secure that obligation.

We see nothing in the Declaration to suggest that it does not create the preexisting lien and continuing obligation to pay assessments described in *Inwood*. The Declaration uses the present-tense to state that the lien it creates exists from the time of its filing. Nor do we see the notice that is the linchpin of Owner's suit as performing any other function than meeting the practical need of informing a homeowner of the amount of the annual maintenance assessment. Also, many of the other events that Owner suggests are preconditions to the effectiveness of the lien are established by the terms of the Declaration and are not contingent on the terms of the notice. These include when an assessment becomes delinquent.

Obviously, different declarations may have different terms, and whether a declaration creates a contractual lien from the time of its filing depends on its specific provisions. *See Kenneth D. Eichner, P.C. v. Dominguez,* No. 14-16-00192-CV, 2017 WL 2561334, at *6 (Tex. App.—Houston [14th Dist.] June 13, 2017, no pet.) (mem. op.) ("[W]e must look to the Association's declaration in the instant case to determine

23

whether the assessment lien attached when the declaration was filed in 1978 or when Dominguez defaulted on the monthly assessments."); *Red Rock Props. 2005, Ltd. v. Chase Home Fin., L.L.C.*, No. 14-08-00352-CV, 2009 WL 1795037, at *3 (Tex. App.— Houston [14th Dist.] June 25, 2009, no pet.) (mem. op.) ("[W]e look to the condominium declaration in the instant case to determine whether the assessment lien attached when the Declaration was filed in 1984 or when the Barbours defaulted on the monthly assessments in November 2004.").

The provisions that we outline next demonstrate that the Declaration at issue provides for a lien that had its inception at the time the Declaration was filed and continued as a charge on the land. And our interpretive task is limited to a review of the Declaration's terms because Owner concedes that he took title to his lot burdened with the Declaration's covenants and because the deed to his lot demonstrates that he did.[11] Further, the parties have cited no statutory provision that impacts the question of whether and how the Declaration creates an assessment lien.[12]

---

[11]The deed conveying the lot to Owner states: "This Deed is executed, delivered[,] and accepted subject to all . . . covenants, restrictions common to the platted subdivision in which said real property is located . . . ."

[12]Unlike condominiums, homeowners' associations do not have a statutory framework. *See* Tex. Prop. Code Ann. §§ 82.001–.164 (Uniform Condominium Act). Although there is a chapter in the Texas Property Code governing the conduct of a homeowners' association in some circumstances, none of the provisions of that chapter provide instruction on how to interpret the provisions of the Declaration here. *See, e.g.*, Tex. Prop. Code Ann. § 209.003 (applicability of Texas Residential Property Owners' Protection Act), § 209.006 (requiring HOA notice before enforcement), § 209.009 (prohibiting certain foreclosure sales based on certain

24

The Declaration creates the HOA for the purpose of "(i) maintaining and administering the common properties and facilities, (ii) administering and enforcing the covenants and restrictions contained herein, and (iii) collecting and disbursing the assessments and charges hereinafter created." The Declaration requires every owner of a lot in the Griffin Parc subdivision to be a member of the HOA. Membership in the HOA grants the owner "a non-exclusive right and easement of use and enjoyment in and to" the common area of the development.[13]

Section 5.01 of the Declaration describes an owner's liability to pay assessments and how that debt is a charge on the land and "a continuing lien":

> Declarant, for each Lot owned by it, hereby covenants and agrees, and each purchaser of any Lot by acceptance of a deed or other conveyance document creating in such Owner the interest required to be deemed an Owner, whether or not it shall be so expressed in any such deed or other conveyance document, shall be deemed to covenant and agree . . . to pay the Association . . . annual maintenance assessments or charges (as specified in <u>Section 5.04</u> hereof), such assessments to be fixed, established[,] and collected from time to time as herein provided . . . . *The annual maintenance*, special capital, and special individual assessments described in this <u>Section 5.01</u> (hereinafter, the "<u>Assessment</u>" or the "<u>Assessments</u>," together with interest thereon, attorneys' fees, court costs[,] and other costs of collection thereof, as herein provided, *shall be a charge on the land and shall be a continuing lien upon each Lot against which any such Assessment is made.* [Emphasis in italics added.]

The assessment pays for managing, improving, and maintaining the common areas.

___

assessments), § 209.0091 (providing owner an opportunity to cure), § 209.0092 (requiring judicial foreclosure).

[13]No one disputes that the lot at issue is a "Lot" as defined in the Declaration or that Owner is an "Owner" as defined in the Declaration.

Section 5.08 of the Declaration does require the HOA's Board of Directors to "fix the date of commencement and the amount of the annual maintenance assessment against each Lot." In turn, that section requires a "[w]ritten notice of all assessments" to be sent to lot owners. But section 5.08 is also clear that the failure to fix a new assessment does not relieve a lot owner of the obligation created by the Declaration to pay assessments:

> (c) The omission of the Board of Directors to fix the assessments within the time period set forth above for any year shall not be deemed a waiver or modification in any respect of the provisions of this Declaration, or *a release of any Owner from the obligation to pay the assessments*, or any installment thereof for that or any subsequent year, but the assessment fixed for the preceding year shall continue until a new assessment is fixed. [Emphasis added.]

The consequences of the failure to pay an assessment are established by section 5.09 of the Declaration. Section 5.09(a) sets the date that an assessment becomes delinquent by stating that "[a]ny Assessment, or installment thereof, which is not paid in full when due shall be delinquent on the day following the due date (herein 'delinquency date') as specified in the notice of such Assessment."

Section 5.09(b) of the Declaration carries forward the theme that liability for the assessment is a continuing debt and that the Declaration creates a lien to secure that debt:

> The unpaid amount of any Assessment not paid by the delinquency date is and shall be, together with the interest thereon as provided in Section 5.09(a) hereof and the cost of collection thereof, including reasonable attorneys' fees, *a continuing debt, secured by, and there is hereby impressed upon*

26

*and created against each Lot, a lien and charge on the Lot of the non-paying Owner . . . .*

> To evidence any lien, the Association shall prepare a written notice of lien setting forth [certain information].  [Emphasis in italics added.]

There is no controversy that the word "hereby" is a reference to the Declaration. Owner's brief "concedes the point of grammar and verb usage, 'there is hereby impressed upon and created against each lot, a lien[]' is present tense.  'Present tense' as in '2001.'  This shows that **a** lien did indeed arise seventeen years ago."

Section 5.09(c) reiterates the theme that the Declaration causes a lien to attach to each lot in the subdivision on the date of its recordation:  "The lien securing the payment of the Assessments shall attach to the Lot belonging to such non-paying Owner upon recordation of this Declaration with the priority set forth in this Section."

Section 5.10 provides for the priority of the assessment lien relative to other liens that may attach to lots in the subdivision after the filing of the Declaration:

> The lien securing the payment of the Assessments shall be subordinate and inferior to the lien of any bona fide first lien mortgage or deed of trust now or hereafter recorded against any Lot; provided, however, that such subordination shall apply only to the Assessments [that] have become due and payable prior to a sale, whether public or private, of such property pursuant to the terms and conditions of any such mortgage or deed of trust.  Such sale shall not relieve the new Owner of such Lot from liability for the amount of any Assessment thereafter becoming due nor from the lien securing the payment of any subsequent assessment.

After a review of its terms, we interpret the Declaration to carry out the standard practice of a declaration to establish and attach a lien to secure the payment of future assessments and to establish an obligation to pay the assessment that runs with the land. Certainly, the Declaration provides for notice. That notice only quantifies the amount of the preexisting debt that runs with the land and to inform the lot owners of that amount. It does not create the debt.

## F. Because the Declaration, not the notice of the assessment amount, created the lien and debt, the HOA did not create or enforce a lien in violation of section 362(a)(4) by sending the notice of the 2016 annual maintenance assessment.

Thus, we come full circle to the Bankruptcy Code and ask if the notice of the amount of the annual maintenance assessment—sent while the Lot was property of the Owner's bankruptcy estate—created or enforced a lien and thereby violated section 362(a)(4). The sending of the notice did not violate the stay.

The notice was not a precondition to the lien or the obligation to pay the annual maintenance assessment. Both were created upon the filing of the Declaration. Under *Inwood*, the lien "existed" from the time of the filing of the Declaration. The supreme court did not hold that the lien came into existence with each assessment but existed from the time of the filing of the declaration. And the obligation to pay the annual maintenance assessment was not the result of the notice but a continuing debt—or as some term it, an equitable servitude—that ran with the land and was incident to the ownership of the lot. The notice of assessment sent by

28

the HOA created neither the lien nor the debt. Nor did the notice set the date of delinquency for the assessment; again, the Declaration set that date.

In the final analysis, a lien that already exists cannot be created in violation of section 362(a)(4). One example that we gave earlier of a lien that secures a future contingent debt was a future advance made under a dragnet clause, and federal courts hold that adding debt to a lien that already exists does not create a lien in violation of section 362(a)(4). *See Beeler v. Jewell (In re Stanton)*, 303 F.3d 939, 942–43 (9th Cir. 2002) (concluding that lender's advance of funds pursuant to future advance clause did not "create" new lien each time an advance was made). Further, performing an act that continues the existence of a lien that is already in place does not create a lien. *See Jacobs v. Brain Power Am., Inc.*, Nos. 2:15-cv-00533-JAD, 2:15-cv-00911-JAD, 2:15-cv-00912-JAD, 2017 WL 834978, at *3 (D. Nev. Mar. 2, 2017) (order) ("The automatic stay is a creature of the bankruptcy code. It prevents a creditor from 'creat[ing], perfect[ing], or enforc[ing]' a lien, and it prohibits a creditor from 'enforcement' efforts against the debtor. What is notably missing is a prohibition on renewing an *existing* judgment." (citation omitted)).

The trial court's judgment also mentions one of the other prohibited acts of section 362(a)(4), which is the enforcement of a lien. It does not find that the HOA enforced its lien but rather that it had allegedly put itself in the position to enforce its lien by giving notice that was "necessary to create an assessment lien which assessment lien was essential to [the HOA's] enforcement action."

We agree that the action of the HOA by sending notice of the 2016 assessment was not an act of enforcement under section 362(a)(4). The definition of the word "enforcement" in section 362(a)(4) does not embrace the HOA's setting and giving notice of the assessment amount. *See Houston Pipeline*, 213 S.W.3d at 427 ("A lien 'is enforced by affirmative action such as filing lawsuits, foreclosing, and filing a notice of lis pendens.'" (quoting *Kocurek v. Arnold (In re Thurman)*, 163 B.R. 95, 100 (Bankr. W.D. Tex. 1994))). The record establishes that the HOA did not file a notice of the assessment lien or foreclose on that lien until after Owner received his discharge and after the automatic stay was no longer in effect.

Accordingly, we sustain the HOA's sole issue.

## VI. Conclusion

Having sustained the HOA's sole issue, we reverse the judgment of the trial court and render judgment that the HOA's sending of the notice of the 2016 annual maintenance assessment did not violate the provisions of section 362(a)(4) of the United States Bankruptcy Code.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: April 25, 2019

30